107 F.3d 888
 323 U.S.App.D.C. 255
 MOBILETEL, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
Columbia Cellular, Inc. and BellSouth Mobility Inc., Intervenors.
 No. 96-1327.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 31, 1997.
Decided March 7, 1997.
Order Denying Rehearing April 29, 1997.
 
 [323 U.S.App.D.C. 257] Appeal of an Order of the Federal Communications Commission.
 Bruce D. Sokler, Washington, DC, argued the cause for appellant, with whom Howard J. Symons and James A. Kirkland were on the briefs.
 Joel Marcus, Counsel, Federal Communications Commission, Washington, DC, argued the cause for appellee, with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, John E. Ingle, Deputy Associate General Counsel, and Roberta L. Cook, Counsel, were on the brief.
 Kenneth E. Hardman, L. Andrew Tollin and Michael Deuel Sullivan, Washington, DC, were on the joint brief for intervenors Columbia Cellular, Inc. and BellSouth Mobility Inc. David G. Frolio, Jim O. Llewellyn, Robert G. Kirk, Walter H. Alford and William B. Barfield entered appearances.
 Before: EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 On August 14, 1996, the Federal Communications Commission ("the Commission") released an order dismissing the application of MobileTel, Inc. ("MobileTel") to provide cellular service in two Rural Service Areas ("RSAs") in Louisiana using frequencies reserved for applicants that already provide "public landline message telephone service," [323 U.S.App.D.C. 258] 47 C.F.R. § 22.902(b) (1988), in those areas. See In re Applications of MobileTel, Inc., FCC 96-345, 1996 WL 459977 (F.C.C.) (August 14, 1996). The Commission concluded that MobileTel was ineligible for the reserved frequencies in these RSAs because the company provided telephone service to customers in these areas only by means of radio links, and the regulation making the provision of "public landline message telephone service" a condition of eligibility excluded companies serving customers only by means of radio links. MobileTel appealed the Commission's order to this court. We affirm.
 
 I. BACKGROUND
 
 2
 The Commission established rules to govern the implementation of cellular communications service in 1981. See Cellular Communications Systems, 86 F.C.C. 2d 469 (1981), modified, 89 F.C.C. 2d 58 (1982), further modified, 90 F.C.C. 2d 571 (1982), petition for review dismissed, United States v. FCC, No. 82-1526 (D.C.Cir.1984). To promote competition in cellular markets, the Commission divided the radio spectrum into two frequency blocks, ensuring that two cellular systems would compete in each market. See id. at 487-93. In making its initial allocation of cellular frequencies, the Commission made the "Block A" frequencies in each market available to "[c]ommon carriers not also engaged in the business of affording public landline message telephone service," 47 C.F.R. § 22.902(b) (emphasis added), and reserved the "Block B" frequencies for common carriers that were engaged directly or indirectly in the provision of "public landline message telephone service." Id. The Commission eliminated this system of separate allocations for landline and non-landline applicants in 1994. See Revision of Part 22 of the Commission's Rules, 9 FCC Rcd 6513 (1994).
 
 
 3
 The Commission reserved the Block B frequencies for companies already providing landline service because it wanted to take advantage of the technical expertise and knowledge of local markets that AT&T and other experienced providers of basic local telephone service had accumulated through years of providing local service. See Cellular Communications Systems, 86 FCC 2d at 488-89 ("Given AT&T's distinctive technical capabilities, and its operation in most major markets, we are left with little doubt that only AT&T is in a position today to place cellular systems in operation around the country in the immediate future."). The Commission also hoped in this way to minimize the number of applications competing for the Block B frequencies in each market. Although in previous license distributions it had allowed providers of landline service to qualify for landline set-aside frequencies in any market, see In re Application of Bonduel Telephone Co., 68 FCC 2d 497 (1978), the Commission deliberately abandoned the Bonduel approach in creating the Block B cellular landline set-aside, deciding instead to permit landline companies to apply for cellular frequencies only in the markets in which they were already providing landline service. See Cellular Communications Systems, 86 FCC 2d at 490 n.56. In this way the Commission hoped to guarantee that in all but a few markets, only one wireline carrier would be eligible for the Block B frequencies, which would eliminate the delay caused by the often drawn-out comparative hearings required for dealing with mutually-exclusive applications under Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). The Commission also expected that rapid approval of the local landline company's application for the Block B frequencies in a market would give competing applicants for the Block A frequencies in that market an incentive to reach a settlement agreement, to prevent the company operating in the Block B frequencies from getting a head start. See Cellular Communications Systems, 86 FCC 2d at 490-91. Except where they threaten its goal of preserving competition, the Commission generally favors measures that streamline the license distribution process--for example by encouraging settlement agreements between competing applicants--in light of its statutory mandate "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges...." 47 U.S.C. § 151.
 
 
 4
 [323 U.S.App.D.C. 259] When the Commission replaced the comparative hearing system with a lottery system in 1983, it expressly declined to discontinue the set-aside for landline companies operating in the relevant market, despite arguments that the abandonment of the comparative hearing system eliminated the need for set-asides designed to streamline the selection process. See Cellular Lottery Rulemaking, 98 FCC 2d 175 (1984), modified, Cellular Lottery Reconsideration Order, 101 FCC 2d 577 (1985), affirmed in pertinent part, Maxcell Telecom Plus, Inc. v. FCC, 815 F.2d 1551 (D.C.Cir.1987). The Commission defended the retention of the landline set-aside on the ground that it continued to promote important goals, notwithstanding the switch to a lottery system. See id. at 192-98. First, the set-aside protected local landline telephone companies from being shut out of their local cellular markets. Were they to be shut out of the local cellular market, these companies would lose customers to the local providers of cellular service, especially in rural areas where the cost of providing landline service is high; eventually the local companies could be forced out of business by their cellular competitors. See id. at 194-95. Individuals served by these small local telephone companies would then be left without telephone service, an outcome which would conflict with the Commission's objective of achieving universal telephone service. Second, the Commission believed that the separate allocation system lent the cellular markets a structure which would foment healthy competition, since the two types of communications carriers would draw upon their respective "traditions of service" to compete for customers. See id. at 196. Third, the set-aside continued to encourage settlement agreements by limiting the number of competing applications, and settlement agreements were still (despite the obviation of comparative hearings by the introduction of a lottery system) thought to serve the public interest by creating synergies between heterogeneous companies and minimizing the administrative burden, delay, and expense involved in dealing with petitions challenging cellular frequency allocations. See id. at 196-97. Fourth, eliminating the set-aside would be unfair to the local telephone companies, because they had previously been precluded by the terms of the set-aside from competing for Block B frequencies in areas where they did not provide landline service. See id. at 197.
 
 
 5
 In October of 1988, MobileTel--an affiliate of Lafourche Telephone Company, Inc. ("Lafourche")--applied for Block B cellular frequencies in the St. James and Plaquemines RSAs in swampy areas on the gulf coast of Louisiana. Competing applications for the St. James RSA were filed by BellSouth Mobility, Inc. ("BellSouth") and Columbia Cellular, Inc. ("Columbia"), and BellSouth also filed a competing application for the Plaquemines RSA. Columbia's (undisputed) claim of eligibility as a "[c]ommon carrier[ ] engaged directly or indirectly in the business of affording public landline message telephone service" in the St. James RSA was based on its affiliation with Reserve Telephone Company, a small, independent, rural telephone company operating a wireline[1] local telephone service in the St. James RSA. MobileTel's claim of eligibility was based on its affiliation with Lafourche, which operated wireline local telephone service outside of the St. James and Plaquemines RSAs, and which had recently instituted local service to one customer inside each of these RSAs using Basic Exchange Telecommunications Radio Service ("BETRS") in place of wireline technology. BETRS is an alternative to wireline technology that is used to connect individual customers' telephones to the service provider's central office; instead of wires, BETRS connects customers to central offices by means of radio transmissions. Where the terrain between the central office and individual customers is rugged (in this case, swampy), and therefore difficult or impossible to span with wires, BETRS facilitates the provision of local service to those customers. The Commission authorized the use of BETRS by local telephone companies in 1988, seven years after the establishment of the landline set-aside, and did not modify the [323 U.S.App.D.C. 260] set-aside subsequent to this authorization. See In the Matter of Basic Exch. Telecomm. Radio Serv., 3 FCC Rcd 214 (1988) ("BETRS Order").
 
 
 6
 MobileTel won the lottery for the Block B frequencies in the St. James and Plaquemines RSAs, and was named the tentative selectee for both. After BellSouth and Columbia formed a limited partnership, BellSouth petitioned the Commission's Mobile Services Division ("MSD") to deny MobileTel's applications on the ground that MobileTel was ineligible because neither it nor its affiliate Lafourche provided wireline telephone service in these RSAs. BellSouth argued that the requirement, under § 22.902(b), that an applicant be providing "landline" service in the area for which it is applying to provide cellular service required the exclusion of applicants serving these areas only by means of non-wireline technologies such as BETRS. The MSD granted MobileTel's applications in October of 1990. See In re Applications of MobileTel, Inc., 5 FCC Rcd 5854 (MSD 1990). Although it acknowledged that the Commission had commonly referred to the Block B frequencies as the "wireline set-aside," and that the provision of BETRS-based service "does not qualify an applicant as a wireline for purposes of Section 22.902(b)," id. at 5855, the MSD reasoned that allowing companies providing local telephone service in particular cellular markets only through BETRS to compete for these frequencies was consistent with the Commission's intent in creating the set-aside. See id. at 5855-56. BellSouth and Columbia each filed petitions for reconsideration of the MSD order, arguing that to allow an applicant providing only non-wireline service to apply for frequencies set aside for providers of "landline" service would violate the plain meaning of the regulation.
 
 
 7
 On January 27, 1995, the Commission adopted (but did not release) an order reversing the MSD and dismissing MobileTel's applications as unacceptable for filing, on the ground that "BETRS is indisputably a radio, not a 'landline' (or 'wireline') service," and that therefore MobileTel did not provide "landline" service in the St. James or Plaquemines RSAs as required for eligibility under § 22.902(b). On February 6, 1995, the Commission announced this order in a press release. On March 23, 1995, the Commission released an order vacating its (still-unreleased) January 27 order, and remanding the matter to the Wireless Telecommunications Bureau ("WTB") with directions that the WTB consider the relevance to the January 27 order of BellSouth's request to withdraw its petition and Columbia's request for approval of its settlement with MobileTel--facts of which the Commission had been unaware when it issued the January 27 order. See In re Applications of MobileTel, Inc., 10 FCC Rcd 10657 (1996). The WTB later recused itself from further participation in the licensing proceeding for reasons unrelated to the issues in this appeal, and the Commission's Office of General Counsel assumed responsibility for making recommendations to the Commission on the remanded matters.
 
 
 8
 On August 14, 1996, the Commission returned to the conclusion it had reached in the never-released January 27 order: MobileTel was ineligible for the Block B frequencies in the St. James and Plaquemines RSAs, because the set-aside for providers of local "landline" service required the exclusion of applicants providing service only by means of non-wireline technologies such as BETRS. See In re Applications of MobileTel, Inc., 1996 WL 459977 (F.C.C.) at 9. The Commission rejected MobileTel's argument that the provision of BETRS service in an RSA could create eligibility for the set-aside, finding this interpretation inconsistent with the plain meaning of the term "landline," the Commission's prior decisions, and the purposes for which the set-aside was implemented. See id. at 4-8. The Commission also observed that allowing BETRS links to create eligibility under § 22.902(b) could enable applicants to undermine the set-aside system. The set-aside was intended to give a leg up to local telephone companies with an established presence in particular geographical areas, on the rationale that these local companies would have a unique reserve of expertise and knowledge about these areas. Because BETRS "loops" linking individual customers in particular RSAs to pre-existing central offices could be thrown up relatively quickly and cheaply, a company operating only BETRS-based local service in an RSA might well have been operating in the area only a [323 U.S.App.D.C. 261] very short while, and thus have no such local expertise. See id. at 8.
 
 
 9
 MobileTel filed this appeal from the August 14 order, and Columbia and Bell South intervened.
 
 II. DISCUSSION
 
 10
 A. The Commission's Construction of the Term "Landline"
 
 
 11
 When we review a challenge to an agency's interpretation of its own regulations, we will accept the agency's interpretation unless it is "plainly wrong." General Carbon Co. v. Occupational Safety & Health Review Comm'n, 860 F.2d 479, 483 (D.C.Cir.1988) (citing United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155-56, 53 L.Ed.2d 48 (1977) and Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)).
 
 
 12
 MobileTel argues that the Commission's construction of the term "landline" in § 22.902(b) of its regulations was plainly wrong because, by construing the term to exclude BETRS-based service, the Commission ignored and undermined the policies underlying the set-aside which that regulation created. Conceding that the Commission commonly used the terms "landline" and "wireline" interchangeably when it instituted what was generally referred to as the "wireline set- aside," MobileTel argues that the Commission's use of these terms prior to the 1988 order authorizing the use of BETRS technology must in retrospect be construed as describing the provision of local telephone service by BETRS, as well as by wires. MobileTel asserts that this must be the case, because excluding BETRS-based service from the set-aside conflicts with the policies underlying both the "wireline set-aside" and the Commission's order authorizing the use of BETRS by local service providers.
 
 
 13
 The Commission's stated intent in creating the set-aside, and in preserving it despite the switch to a lottery system, was to protect telephone companies that were small, that had a presence in the particular area in which cellular service was to be licensed, that might be squeezed out of the market altogether if they failed to land a local cellular license, and the demise of which would leave some customers with no local telephone service at all. See Cellular Lottery Rulemaking, 98 FCC 2d at 192-98. MobileTel argues that all of these factors should apply to companies providing local service via BETRS, and claims that as a provider of local BETRS-based service to customers in the St. James and Plaquemines RSAs, it has the same expertise and knowledge of these markets as a company that had set up wireline links in these RSAs would have. MobileTel also accuses the Commission of unfair and contradictory behavior, arguing that the Commission first encouraged local telephone companies to use BETRS, and then "puni[shed]" companies who took the bait by denying them eligibility for the "wireline set-aside" frequencies. Amended Brief for Appellant at 33.
 
 
 14
 When MobileTel filed its application, the Commission's rules included no definition of the term "landline" or of the phrase "public landline message telephone service." The Commission points out that a 1986 dictionary of industry terms defined "landline" in such a way as to include only wire-based or cable-based service, see Brief for Appellee at 22, while MobileTel cites a 1993 industry dictionary including fiber optic and microwave links in the definition. See Reply Brief for Appellant at 8 n.20. Given the facts that no statutory definition accompanied the regulation, and that industry dictionaries offer conflicting definitions which arguably could reflect the very sort of technological "updating" on which MobileTel's argument is premised, we obviously cannot resolve this dispute solely on the basis of the "plain meaning" of the word "landline" or of the phrase "public landline message telephone service" divorced from the policies underlying the set-aside. Cf. In the Matter of Xerox Corp. and MCI Communications Corp., 90 FCC 2d 547, 550-54 (1982) (finding that the lack of a statutory definition of the term "public landline message telephone service" precluded a "plain meaning" answer to the question of whether a service not in existence at the time the regulation was drafted should fall within the scope of the phrase, and turning to other Commission policies and decisions to answer the question). The Commission's interpretation of "landline," and of the phrase in which [323 U.S.App.D.C. 262] it appeared in § 22.902(b), certainly was not clearly wrong under any "plain meaning" analysis, and thus we turn to the other grounds on which MobileTel challenges the Commission's interpretation.
 
 
 15
 The "wireline set-aside" was intended to benefit small telephone companies with a presence in a local market--companies with local expertise and experience, that could be squeezed out of business if they failed to land a local cellular license. MobileTel's argument that it was unreasonable for the Commission to exclude from this category companies that serve a market only via BETRS "loops" is disproved by the record in this case, which indicates that the sum and substance of MobileTel's "presence" and "experience" in the St. James and Plaquemines RSAs was the extension of radio service to one customer in each RSA--and even these minimal excursions were set up just in time to support MobileTel's applications for the Block B cellular frequencies in these areas. The Commission's additional rationale based on its desire to minimize the number of competing applicants for each RSA also was served by the Commission's interpretation barring providers of only BETRS-based service. Thus we must reject MobileTel's argument regarding the policies underlying the "wireline set-aside" because the Commission's construction of the term "landline" is consistent with several of these policies, and because only the Commission may decide how much precedence particular policies will be granted when several are implicated in a single decision.
 
 
 16
 Nor is the Commission's authorization of the use of BETRS to provide local telephone service fundamentally incompatible with its refusal to permit BETRS links alone to create eligibility for the "wireline set-aside." Had the Commission, in authorizing the provision of local service via BETRS, intended for BETRS service to be treated identically with wireline service in all respects, we doubt that the Commission would have enumerated certain contexts in which it intended for BETRS service and wireline service to be treated similarly. See BETRS Order, 3 FCC Rcd at 223 n.10 ("It is our intention that wire and radio basic exchange service be treated similarly with regard to eligibility for high cost assistance."). Merely declining to extend them eligibility for a special set-aside cannot fairly be described as "punishing" companies that set up BETRS links. Nor can we accept MobileTel's argument that the introduction of BETRS technology implied a radical alteration in the definitions of the terms "landline" and "wireline"; we note that BETRS is not the first technology to substitute for wires in the provision of local telephone service--the replacement of wireline links with cellular, fiber optic, or "point-to-point microwave" service predated the authorization of BETRS service, and none of these technologies was thought to have implied any redefinition of the terms "landline" or "wireline."[2]
 
 
 17
 MobileTel also argues that even if the Commission's interpretation of the term "landline" was not plainly wrong, the Commission was obliged to waive the eligibility requirement for MobileTel in light of the policies underlying the set-aside and the authorization of BETRS service. See Amended Brief for Appellant at 36-39. In its order, the Commission expressly declined to waive the eligibility rules for MobileTel because it was "unpersuaded that the purposes underlying [the] eligibility rule would be frustrated absent a waiver," In re Applications of MobileTel, Inc., 1996 WL 459977 (F.C.C.) at 7, and cited the same policy justifications that it applied in support of its construction of the term "landline." These justifications adequately support the Commission's refusal to grant MobileTel a waiver, particularly in light of the fact that MobileTel's extension of local service in the St. James and Plaquemines RSAs was extremely limited in tenure and scope, and thus MobileTel was distinctly not in the genre of companies that the Commission intended for the set-aside to benefit.
 
 
 18
 [323 U.S.App.D.C. 263] Because the Commission's interpretation of the term "landline" as used in § 22.902(b) of its regulations was reasonable and consistent with several of the Commission's relevant policies, we easily conclude that this interpretation was not "plainly wrong."
 
 B. The Commission's Notice to Applicants
 
 19
 MobileTel next argues that even if the Commission's construction of its rule was not plainly wrong and the Commission was justified in refusing to waive the rule, we should overturn the August 14 order because the regulation "as written," and the Commission's interpretation of it in prior orders, had given MobileTel the reasonable impression that the set-aside "covered all parties who provide local telephone service in an area," whether by wires or by an alternative technology. Amended Brief for Appellant at 40-41 (citing McElroy Elec. Corp. v. FCC, 990 F.2d 1351, 1358-63 (D.C.Cir.1993)). MobileTel bases this argument on the same theories it offered in support of its assertion that the Commission's interpretation of the regulation was unreasonable.
 
 
 20
 In McElroy, we reversed a Commission order dismissing several applications for cellular licenses as untimely filed because we found that under a "fair reading," the Commission's order establishing the timeline for applications failed to give prospective applicants for the licenses notice of the proper time window for filing. Id. at 1358. Because we doubted that the Commission's interpretation of its order was "reasonably comprehensible to [people acting in] good faith" at the time the order was issued, id. (quoting Maxcell Telecom Plus, Inc., 815 F.2d at 1558 (quoting Bamford v. FCC, 535 F.2d 78, 82 (D.C.Cir.1976) (quoting Radio Athens, Inc. (WATH) v. FCC, 401 F.2d 398, 404 (D.C.Cir.1968))) (emphasis added by the Maxcell court)), we ordered the reinstatement of several applications.
 
 
 21
 In this case, MobileTel itself describes the Commission's construction of the term "landline" as "literalistic," Amended Brief for Appellant at 19, suggesting that MobileTel's notice argument is premised on the extraordinary assertion that a "good faith" applicant trying to give the regulation a "fair reading" would not have understood that the term "landline" was to be read "literally." What makes it even more implausible that MobileTel could have misunderstood the term "landline" is the fact that only two months before Lafourche set up BETRS links in St. James and Plaquemines, the Commission had announced in In re Application of the Offshore Telephone Co., 3 FCC Rcd 4601 (1988), that the provision of exclusively radio-based service in an RSA does not render a company eligible for the "wireline set-aside" frequencies in that RSA. (MobileTel was even better situated to mark the significance of the Offshore decision than were other "good faith" readers of the Commission's regulation, because MobileTel's parent SJI, Inc. was a party to the Offshore case.)
 
 
 22
 Because we believe a good faith prospective applicant for the Block B frequencies in the St. James and Plaquemines RSAs would, upon giving § 22.902(b) of the Commission's regulations a fair reading, have understood that the provision of only BETRS-based service in these RSAs would not create eligibility for these frequencies, we reject MobileTel's notice argument.
 
 
 23
 C. The Commission's Refusal to Consider MobileTel's Settlement Agreement With Columbia
 
 
 24
 Finally, MobileTel argues that the Commission acted arbitrarily and capriciously in dismissing its applications because MobileTel and Columbia had arrived at a settlement agreement, and the Commission failed to consider the possibility that dismissing MobileTel's application would contravene the purpose of the Commission's directives encouraging mutually-exclusive applicants to create such agreements. The Commission clearly does have a policy of encouraging settlements, see Cellular Communications Systems, 86 FCC 2d at 490-91, but MobileTel itself acknowledges that this policy does not extend so far as to justify the approval of a settlement agreement if that would result in the grant of a license to an unqualified applicant. See Amended Brief for Appellant at 14 n.40 (citing In re Applications of Kannapolis Television Co., 1 FCC Rcd 1037, 1039 (1986)). Because MobileTel was ineligible for the Block B frequencies, the Commission [323 U.S.App.D.C. 264] did not act arbitrarily or capriciously in dismissing MobileTel's application despite the fact that MobileTel had entered into a settlement agreement with an eligible entity.
 
 
 25
 MobileTel also claims that in remanding the matter to the WTB for its consideration of the settlement agreement's relevance, the Commission must have relied on the assumption that MobileTel was eligible for the set-aside frequencies, because otherwise it would by its remand have been directing the WTB to engage in "the vain act of promoting a settlement with an unqualified party." Amended Brief for Appellant at 47. But at that point the Commission might have lacked the full panoply of information needed to determine whether its policy barring the acceptance of settlements involving unqualified entities would apply. For example, a settlement involving an ineligible entity may be acceptable if, under the agreement, the ineligible entity is to hold only a noncontrolling interest in the entity to be granted the license. See In re Applications of Advanced Mobile Phone Serv., Inc., 93 FCC 2d 683, 691-93 (1983). Thus, because the Commission might reasonably have thought that the possible relevance of the settlement agreement to the January 27 order was a matter for the WTB to address in the first instance, the March 23 order cannot be viewed as a final determination-by-implication that MobileTel was eligible for the set-aside frequencies.
 
 
 26
 For the foregoing reasons, the Commission's August 14 order dismissing MobileTel's applications for "wireline set-aside" frequencies in the St. James and Plaquemines RSAs as ineligible under 47 C.F.R. § 22.902(b) is hereby
 
 
 27
 Affirmed.
 
 
 28
 Before: EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.
 
 ORDER ON REHEARING
 April 29, 1997
 
 29
 Per Curiam.
 
 
 30
 Upon consideration of appellant's petition for rehearing filed April 21, 1997, it is ORDERED that the petition be denied.
 
 
 31
 MobileTel did not articulate the argument that it now claims this court overlooked until the oral argument, but our decision nevertheless adequately addressed this argument. Our decision included a reference to the Federal Communications Commission's decision in Xerox Corporation, 90 F.C.C.2d 547 (1982), which MobileTel now claims we overlooked, in which we explained that the Commission's action under review was entirely consistent with Xerox, because in Xerox (as in the action under review) the Commission had considered the policies underlying its regulations in order to determine how the regulations should be construed. See MobileTel, Inc. v. F.C.C., 107 F.3d 888, 894-95 (D.C.Cir.1997). Our decision also observed that the Commission had declined to extend eligibility for the set-aside that MobileTel sought to other technologies that were used in the provision of local service, indicating that the Commission had not (as MobileTel now claims) ignored its own policies and the technologies used to provide local service in deciding whether to make the set-aside available to particular service providers. See id. at 895-96.
 
 
 
 [1]
 The term "wireline" describes a system in which the connections between individual customers and central offices are made by wires, as opposed to alternative technologies such as radio links
 
 
 [2]
 A portion of the Commission's 1988 regulations not directly involved in this case demonstrates that all of the technologies encompassed by the Rural Radio Service were, at the time of MobileTel's application, explicitly treated by the Commission as alternatives to "wireline" service, rather than as types of service subsumed within the definition of "wireline." See 47 C.F.R. § 22.609(a) (1988) ("Each application in [the Rural Radio Service] shall be accompanied by a showing why it is impracticable to provide the required communication service by means of wireline facilities.")