**WESTERN RADIO SERVICES COMPANY, INC., an Oregon Corporation; Richard L. Oberdorfer, Plaintiffs–Appellants,**

v.

**Daniel GLICKMAN, in his official capacity as Secretary, United States Department of Agriculture; Jack Ward Thomas, Chief, USDA Forest Service; Gordon H. Small, USDA Forest Service, Director of Lands; John Lowe, USDA Forest Service, Pacific Northwest Regional Forester; Charles Graham, USDA Forest Service, Fremont National Forest Supervisor; Charles Stocks, USDA Forest Service, Silver Lake District Ranger, Defendants–Appellees.**

No. 96–35773.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 1997.

Decided May 7, 1997.

---

Paul Merrell, Eugene, Oregon, for plaintiffs-appellants.

Tamara N. Rountree, United States Department of Justice, Washington, DC, for defendants-appellees.

Before: FLETCHER and TASHIMA, Circuit Judges, and SCHWARZER,* District Judge.

FLETCHER, Circuit Judge:

Western Radio Services Company ("Western") and its president, Richard Oberdorfer, appeal from the district court's grant of summary judgment in favor of the United States Forest Service ("Service"). This dispute arises out of the Service's decision to grant a special use permit to Central Oregon Cellular ("Cellular One") for a telecommunications facility on Dead Indian Mountain. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

Dead Indian Mountain is located in Lake County, Oregon, in the Silver Lake District of Fremont National Forest. At the time Cellular One applied for the disputed permit, several entities already operated electronic communications facilities on Dead Indian Mountain pursuant to special use permits issued by the Service.

### Administrative Proceedings

On August 17, 1994, Cellular One applied to the Service for a special use permit. Cellular One's application proposed construction on Dead Indian Mountain of a 100–foot, self-supporting, steel-lattice tower holding four antennas and three microwave dishes, and a separate prefabricated concrete equipment shelter. The proposed site previously had served as a communications site. Cellular One stated in its application that it had considered and rejected eight alternative locations; the application provided a detailed explanation for each rejection.

Cellular One anticipated that it would have tower and building space for co-location by other users, such as emergency services. It stated in its application that the Oregon

State Police had expressed an interest in co-location. Cellular One therefore requested that it be designated as "facility manager" for the site.

On October 6, 1994, Western submitted a request to the Service under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), for "all applications for a Special Use Permit or Permits for occupancy at the Dead Indian Communication Site ... received within the last 30 days, and/or any applications pending approval or denial." The Service complied, and sent Western the Cellular One application. On October 24, 1994, Western telephoned the Service to request site plans, documentation prepared pursuant to the National Environmental Policy Act ("NEPA"), and a copy of the Forest Plan for electronic sites on Dead Indian Mountain. Again, the Service complied.

The Service began processing Cellular One's application. On January 18, 1995, the Service issued a notice to interested parties that it would be conducting an environmental analysis regarding Cellular One's proposed special use permit. On the same day, Western submitted an application for a special use permit to construct and operate a telecommunications facility in precisely the same location on Dead Indian Mountain as that for which Cellular One had applied.[1]

On February 7, 1995, District Ranger Stocks acknowledged receipt of Western's application. Stocks' letter advised Western that "[t]he site you have requested has already been spoken for by another applicant so their [sic] application will take precedence over your request." Thereafter, Western and the Service engaged in a series of communications regarding the applications of Cellular One and Western for the Dead Indian Mountain site. On March 1, 1995, Cellular One submitted comments to the Service identifying problems with Western's proposed facility. On March 28, 1995, the Service advised Western that it was not seeking a "site manager" for the Dead Indian Mountain site, that it would continue to require

---

* Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

1. Western's application proposed a "multiuser facility" consisting of a 150–foot guyed tower, a metal building, and a propane tank.

each user on the site to apply for and receive a separate permit, and that pursuant to direction from the Washington Office suspending multi-user permit authorization (the "Small letter"), it would treat both Cellular One's and Western's applications as requests for single-user permits. The Service also stated that it processes applications in the order received and therefore would grant priority to Cellular One's application. The letter concluded: "We have told you that your application would also be processed. However, the specific location you have requested has been applied for and you will either have to select another location or co-locate with another user."

On April 7, 1995, Western met with the Service. Western requested that the Service consider requiring Cellular One to co-locate on an existing site or to find an alternative location for its proposed facility. Oberdorfer told the Service that he would not participate in the meeting if Cellular One's representative, Ron Fowler, attended because Oberdorfer's attorney had advised him not to have contact with Fowler (due to pending litigation in another matter). However, later on April 7, the Service telephoned Fowler to explore alternatives to Cellular One's proposed design and location. Fowler informed the Service that he had met with Oberdorfer the previous day and had attempted, unsuccessfully, to resolve the conflict between their respective permit applications.

On April 10, 1995, the Service granted Cellular One a special use permit for the Dead Indian Mountain site. On April 18, 1995, the Service informed Western that it had granted Cellular One's application after Cellular One had determined it could not co-locate feasibly with existing users. On April 27, 1995, Western wrote to the Service, objecting to the decision to grant Cellular One's permit request. On May 26, 1995, the Service issued a single-user permit to Cellular One. The permit did not authorize Cellular One to lease space to tenants, but stated that "[i]f tenant use is authorized, this permit will be amended to include multiple user clauses." [2]

## District Court Proceedings

On July 3, 1995, Western filed a complaint in the district court against the Service for declaratory and injunctive relief. Western also moved for a temporary restraining order and a preliminary injunction to prevent Cellular One from constructing or operating its facility. On July 11, 1995, the district court held a hearing on Western's motion. Cellular One moved to intervene. The court denied Western's motion and allowed Cellular One to intervene only for the purpose of appearing at that hearing.

On July 12, 1995, Western filed an amended complaint. The complaint consisted of two causes of action and fourteen counts, alleging violations of the Administrative Procedures Act ("APA"), NEPA, the Forest Service Handbook and Manual, the Fremont National Forest Plan, and the doctrine of *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

The Service moved for summary judgment and filed a statement of material facts. Western cross-moved for summary judgment and filed objections to the Service's statement of material facts. Cellular One filed a motion in opposition to Western's summary judgment motion, although it was not formally an intervenor.

On November 14, 1995, the district court held a hearing on all pending motions. Before the district court issued its decision, Western abandoned all claims based on alleged violations of the Forest Service Handbook, the Forest Service Manual, or NEPA. On July 2, 1996, the district court granted summary judgment to the Service. This appeal followed.

## II. STANDARD OF REVIEW

■ We review de novo the district court's grant of summary judgment. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). We must view the evidence in the light most

---

**2.** Cellular One has completed construction of its facility and is now providing cellular phone service in south central Oregon. Cellular One also has acquired a tenant, Lake County 911. The Forest Service replaced Cellular One's permit with a communications lease in December 1996.

favorable to the nonmoving party, Western, and determine whether a genuine issue of material fact exists for trial and whether the district court correctly applied the relevant substantive law. *Id.*

 We review the Service's decision from the same position as the district court. *Nevada Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 715 (9th Cir.1993). We therefore examine whether the Service considered the proper factors in granting Cellular One's application and whether the permit decision constituted a clear error of judgment. *Western Radio Serv. Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996). This standard of review is narrow; we may not substitute our own judgment for that of the Service, *id.; see also Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989), and may overturn the Service's decision only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

### III. APA CLAIM

Western alleges that the Service failed to follow procedures mandated by the National Forest Management Act, 16 U.S.C. § 497 ("NFMA"), and its implementing regulations. Western claims that the Service failed to consider Western's application jointly with that of Cellular One, that the Service failed to determine which of the two proposed facilities would better serve the public interest, and that the Service erred in granting Cellular One a permit on a "first come, first served" basis. Western also argues that the Service's decision granting a permit to Cellular One was unlawful because the Service did not set a "cut-off" date for applications for the Dead Indian Mountain site.

Western rests these claims on the APA. In order to survive a summary judgment motion, Western must demonstrate that a genuine factual dispute remains as to whether the Service's permitting decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 702(2); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). Western fails to meet this requirement.

### A.

The NFMA authorizes the Secretary of Agriculture ("Secretary") to issue permits for industrial or commercial facilities on national forest land.[3] 16 U.S.C. § 497(c). The Secretary has promulgated regulations implementing the NFMA and authorizing the Service to issue special use permits (aka special use authorizations) for specified activities on national forest lands. 36 C.F.R. §§ 251.50–251.65. The Service may issue special use permits for electronic communications facilities. *Id.* § 251.53(*l*)(5).

Potential permit seekers are encouraged to contact the Service before applying to identify potential constraints, including possible land use conflicts. *Id.* § 251.54(a). A permit seeker must file a formal application with the Service; application guidelines are set forth at 36 C.F.R. § 251.54(e)(2)(ii). After receiving and acknowledging an application, the authorized officer must: (1) assess the applicant's qualifications; (2) complete an environmental analysis, assessment, and/or impact statement under NEPA; (3) determine compliance with applicable statutes, regulations, and orders; (4) engage in consultations with other agencies, local officials, and interested parties; (5) hold public meetings if sufficient interest exists to warrant the time and expense; and (6) "take any other action necessary to fully evaluate and make a decision to approve or deny the application and to prescribe suitable terms and conditions." 36 C.F.R. § 251.54(f)(2).

---

3. The NFMA provides in pertinent part:
 The Secretary of Agriculture is authorized, under such regulations as he may make and upon such terms and conditions as he may deem proper, ... to permit the use and occupancy of suitable areas of land within the national for-
 ests ... for the purpose of constructing or maintaining buildings, structures, and facilities for industrial or commercial purposes whenever such use is related to or consistent with other uses on the national forests.
 16 U.S.C. § 497(c).

The Service has broad discretion to grant or deny a special use permit. It may deny a permit application if, inter alia, the proposed use would be inconsistent or incompatible with other uses, or if the proposed use would not be in the public interest. *Id.* §§ 251.54(i)(1)–(2). If it issues a special use permit, the Service may include such terms and conditions as it deems necessary. *Id.* § 251.56(a)(2). Permit holders must pay the Service an annual fee based on the fair market value of the rights and privileges authorized. *Id.* § 251.57(a).

Neither the NFMA nor the Service's regulations establish procedures for considering competing permit applications.

### B.

█ The Service received Cellular One's application in August 1994. On October 12, 1994, the Service sent Cellular One's technical data and a letter requesting input on potential interference to all permitted users on Dead Indian Mountain. Also in October 1994, the Service sent copies of Cellular One's permit application and related documentation to Western. After Western applied for the same site, the Service acknowledged Western's concerns regarding Cellular One's application and met with Western to discuss the conflict between Cellular One's and Western's proposed facilities. The Service also conducted internal consultations on the potential impacts of Cellular One's facility. These steps satisfied the Service's obligation to "consult with other agencies, local officials, or interested parties and hold public meetings ... when sufficient interest exists to warrant the time and expense." 36 C.F.R. § 251.54(f)(2).

On January 18, 1995, the Service issued a NEPA scoping notice to 75 interested parties, including Western. This notice requested information on any issues or concerns related to Cellular One's proposed facility. The Service received ten responses, which

identified potential dangers to cultural resources and sensitive plants. The Service incorporated into Cellular One's permit various measures to mitigate potential resource damage and interference. After completing the scoping process and an environmental analysis, the Service concluded that Cellular One's proposed facility did not constitute a major federal action and would have no significant environmental effects. The Service therefore determined that the application did not warrant an environmental impact statement or environmental assessment. The Service fulfilled its duty to "complete an environmental analysis, assessment and/or an environmental impact statement under [NEPA]." 36 C.F.R. § 251.54(f)(2).

In its decision memorandum, the Service stated that granting Cellular One a permit was consistent with the Fremont National Forest Plan and that the project would comply with the Clean Water Act, would have no significant impact on endangered, threatened, or sensitive species, or on "park land, floodplains, wetlands, prime farmlands, wild and scenic rivers, or ecologically critical areas." The Service found no anticipated significant impacts on consumers, minority groups, Native Americans, women, or civil rights, no known adverse environmental effects, and no threat to public health or safety. The Service therefore determined compliance with applicable statutes, regulations, and orders, as required. 36 C.F.R. § 251.54(f)(2).

Western points to no specific statutory or regulatory provision with which the Service failed to comply in issuing a special use permit to Cellular One for the Dead Indian Mountain site. To the contrary, the Service followed the required procedures and its decision to grant Cellular One a permit was not arbitrary, capricious, an abuse of discretion, or contrary to law. Accordingly, Western's APA claims must fail.[4]

### IV. *ASHBACKER* CLAIM

Western argues that the Service violated the *Ashbacker* doctrine by failing to consider

---

4. Western does not appear to raise an APA claim regarding the Service's processing of Western's application. However, if this is Western's intention, its claim is not ripe for our review. The Service apparently has not yet granted or denied Western's application for a special use permit on

Dead Indian Mountain. Therefore, with respect to Western's permit, the Service has taken no final, reviewable action. *See* 5 U.S.C. § 704; *Abbott Lab. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967).

jointly Western's and Cellular One's "mutually exclusive" applications. We hold that *Ashbacker* does not apply to the Service's decision to grant a special use permit.

## A.

*Ashbacker Radio Corp. v. FCC* involved two broadcasting companies seeking to broadcast over the same radio frequency. Ashbacker applied for a license two months after Fetzer Broadcasting Company, but before the Federal Communications Commission ("FCC") had acted on Fetzer's application. *Ashbacker,* 326 U.S. at 328, 66 S.Ct. at 148–49. Both applications were at the same stage in the review process. They were "actually exclusive" in the sense that only one could broadcast over the particular frequency for which both had applied. *Id.* at 332, 66 S.Ct. at 150–51. The FCC granted Fetzer's application and, the same day, scheduled a hearing on Ashbacker's application.

The Supreme Court held that consolidated consideration was required. Because the FCC was considering two mutually exclusive applications for "a facility which can be granted to only one," *id.,* only joint consideration would guarantee the applicants their statutory right to a hearing on their applications. *Id.* at 333, 66 S.Ct. at 151. Otherwise, the later-heard applicant would bear the heavier burden of proving that its proposal warranted revoking an existing license. *Id.*

A literal reading of *Ashbacker* suggests that the Service satisfied the holding of that case by communicating with Western and Cellular One regarding their applications for the same site and by meeting with Western to discuss the conflict before granting Cellular One's application. The district court so found. However, after careful consideration of *Ashbacker* and its progeny, we conclude that the Service's permitting decision should not be subject to the *Ashbacker* doctrine and that Western's and Cellular One's applications were not mutually exclusive in the sense *Ashbacker* contemplates.

## B.

*Ashbacker* involved two applications for a single radio frequency for which only one broadcaster could receive a license. In the fifty-odd years since *Ashbacker,* the vast majority of cases relying on it have involved FCC licensing decisions.[5] The second largest group has involved route authorizations by the Civil Aeronautics Board.[6] A dozen cases have applied *Ashbacker* to decisions by the Federal Energy Regulatory Commission or its predecessor, the Federal Power Commission.[7] A few cases have considered *Ashbacker* in reviewing decisions of the Interstate Commerce Commission.[8]

In *Federal Home Loan Bank Bd. v. Rowe,* 284 F.2d 274 (D.C.Cir.1960), the District of Columbia Circuit considered whether the Federal Home Loan Bank Board was obli-

---

**5.** *See, e.g., State of Oregon v. FCC,* 102 F.3d 583, 584 (D.C.Cir.1996); *McElroy Elec. Corp. v. FCC,* 86 F.3d 248, 253 (D.C.Cir.1996); *Washington Util. & Transp. Comm'n v. FCC,* 513 F.2d 1142, 1165 (9th Cir.1975). Congress has codified *Ashbacker*'s comparative hearing requirement for certain FCC licenses. 47 U.S.C. § 309(e). The FCC has established rules for processing competing applications, including cut-off dates for filing competitive applications. *See McElroy,* 86 F.3d at 253. The "often drawn-out" *Ashbacker* hearings have been a source of considerable delay in the FCC licensing process. *See MobileTel, Inc. v. FCC,* 107 F.3d 888, 891 (D.C.Cir.1997).

**6.** This line of cases treats *Ashbacker*'s holding as a mere "rule of fairness" in the complex route authorization context. *See Delta Airlines, Inc. v. Civil Aeronautics Bd.,* 497 F.2d 608, 612–13 (D.C.Cir.1973); *Eastern Air Lines, Inc. v. Civil Aeronautics Bd.,* 243 F.2d 607, 609 (D.C.Cir. 1957) (stating that *Ashbacker* does not provide a

basis for requiring the Board to conduct "a massive consideration of the whole of American air transportation").

**7.** *See, e.g., City of Dothan v. FERC,* 684 F.2d 159 (D.C.Cir.1982) (granting an exclusive contract to construct a hydroelectric facility in a particular region); *Midwestern Gas Transmission Co. v. FERC,* 589 F.2d 603 (D.C.Cir.1978) (granting an exclusive authorization to import Canadian gas on a particular pipeline segment).

**8.** In at least two of these cases the court concluded that the authorization in question was not exclusive and did not implicate *Ashbacker.* *See Railway Express Agency, Inc. v. United States,* —— U.S. ——, 82 S.Ct. 466, 7 L.Ed.2d 432 (1962); *Central Freight Lines, Inc. v. United States,* 669 F.2d 1063, 1073 (5th Cir. Unit A 1982) (freight route does not involve *Ashbacker* mutual economic exclusivity).

gated to afford consolidated consideration to applicants for a federal savings and loan association charter. The court declined to extend *Ashbacker* to this situation, noting that

> no group of associates was given a statutory status. No 'right' was conferred. Unlike the situation in *Ashbacker* ..., the basic statute here did not entitle competing groups of applicants to a comparative hearing.

*Id.* at 275. Because the relevant statute provided no right to a hearing and because Congress "clearly reposed in the Board a wide discretion" to grant or deny applications, the court concluded that joint consideration was not required. *Id.*

■ The Court's holding in *Ashbacker* preserved the applicants' statutory right to a hearing, but did not interfere with the FCC's decision-making procedures. *See Ashbacker,* 326 U.S. at 333, 66 S.Ct. at 151 ("We hold only that where two *bona fide* applications are mutually exclusive, the grant of one without a hearing to both deprives the loser of the opportunity *which Congress chose to give him.*") (emphasis added). Neither the NFMA nor the regulations provide special use permit applicants with a right to a hearing. A special use permit for a telecommunications use may include conditions requiring the holder to co-locate with other users, to accommodate other landusers, or to avoid creating interference. *See* 36 C.F.R. §§ 251.55(b), 251.56. While the Service may solicit competitive bids for projects it wishes to initiate, it has no statutory or regulatory obligation to award special use permits on a competitive basis and was not seeking bids for the construction or management of a facility on the Dead Indian Mountain site. We therefore hold that *Ashbacker* does not provide Western with a claim against the Service.

### C.

■ Even if *Ashbacker* required the Service to consolidate consideration of mutually exclusive permit applications, Western's and Cellular One's applications were not mutually exclusive in the *Ashbacker* sense. In the *Ashbacker* line of cases, "mutually exclusive" applications are those which compete for a single available authorization; the grant to one applicant absolutely precludes all other applicants from operating in the location at issue. Accordingly, *Ashbacker* exclusivity has been construed as "economic" exclusivity. *See Public Util. Comm'n v. FERC,* 900 F.2d 269, 277 n. 6 (D.C.Cir.1990) ("It is economic not legal mutual exclusivity that triggers *Ashbacker.*"); *Central Freight Lines, Inc. v. United States,* 669 F.2d 1063, 1073 (5th Cir. Unit A 1982); *see also Washington Util. & Transp. Comm'n v. FCC,* 513 F.2d 1142, 1165–66 (9th Cir.1975); *Carroll Broadcasting Co. v. FCC,* 258 F.2d 440, 443 (D.C.Cir.1958).

Here, Cellular One applied for a permit to construct a tower and equipment shelter on a particular site to support its microwave cellular telephone communications services. Western applied for a permit to construct a tower and shelter on the same site to support its radio and mobile telephone services. These applications were "mutually exclusive" only in the sense that only one applicant could construct a tower in the precise location both requested. However, the Service discussed alternative sites on Dead Indian Mountain with both Cellular One and Western. Each applicant apparently viewed the contested site as the "ideal" location for its facility, but each also asserted that its facility could accommodate the other's activities. Also, regardless of which applicant built a tower and equipment shelter at the site, each could receive a permit to conduct its telecommunications activities at that site. In fact, the Service advised both applicants that they would not be considered for a "multi-user" or "facility manager" permit and that each operator at the site would need to obtain a separate permit.

Furthermore, Western and Cellular One are not direct competitors in the same communications market. They provide different types of communications services and serve different customer bases. Western does argue that Cellular One's permit deprives Western of the economic opportunity to rent tower space to other users. However, Cellular One's permit deprives Western only of the opportunity to rent tower space to others at that particular site. If Western's objec-

tive is to build a tower for the purpose of profiting from rent payments, it may apply for a tower-construction permit at another site on Dead Indian Mountain. The Service has identified other sites on the mountain which may be suitable for tower construction.

Western also claims that the contested site is the only place on Dead Indian Mountain from which it can conduct its broadcasting activities. However, Cellular One has offered to accommodate Western, and Western still may apply for a special use permit to co-locate with Cellular One or may pursue a tenancy arrangement with Cellular One. Western's permit application is not mutually exclusive with that of Cellular One; even if *Ashbacker* applied, Western would not be entitled to consolidated consideration.[9]

## V. "SMALL LETTER" CLAIMS

The Service issues two types of special use permits to telecommunications operators. A "single-user" permit authorizes the holder to operate its own facility or to conduct its operations from another permit-holder's facility. A "multi-user" or "facility manager" permit authorizes the permit holder to lease space to other operators at its facility. Multiple users may occupy a single communications facility under either type of permit. The difference lies in the fee structure: each single-user permitee pays a permit fee to the Service, whereas only the holder of a multi-user permit, the "facility manager," pays a fee to the Service and tenant users pay a fee directly to the permit holder. In either the single-user or multi-user permit situation, the facility owner may charge rent to tenant operators. Neither the NFMA nor the Service's regulations expressly provides for these two types of permits.

On November 5, 1993, Gordon Small, the Service's Director of Lands, issued a letter directing all local units of the Service to discontinue issuing multi-user special use permits for communications sites until the Service established consistent fee structures

and permit designs. On October 27, 1995, the Service published a final fee schedule for communications uses on national forest lands. 60 Fed.Reg. 55090 (Oct. 27, 1995).

Western challenges the Service's application of the Small letter's direction to Western's permit request. Western claims that the letter "acts as a substantive rule and alters an existing regulatory scheme" without undergoing notice and comment procedures, *see Mt. Diablo Hosp. Dist. v. Bowen,* 860 F.2d 951, 956 (9th Cir.1988), and that Western has been injured by the Service's reliance on the letter to bar it from obtaining a multi-user permit.

We have difficulty accepting Western's argument that the Small letter has substantive regulatory effect, considering that neither statute nor regulation governs the Service's issuance of single-user versus multi-user permits and that the fee structure for special use permits lies within the Service's discretion. 36 C.F.R. § 251.57. Western acknowledges that the Small letter merely postponed issuance of multi-user permits, but argues that the Service *interpreted* the letter to bar such permits. Even if Western's arguments are accurate, Western's challenge to the Small letter is moot.

■ The Service did not actually grant or deny Western's permit application in reliance on the Small letter, since the Service has not finally acted on Western's application. The Small letter has been superseded by a published fee schedule, which does authorize multi-user permits. *See* 60 Fed.Reg. at 55102. The Small letter therefore has no current effect or continuing consequences, and Western's challenge to it is moot. *See Schering Corp. v. Shalala,* 995 F.2d 1103, 1105–06 (D.C.Cir.1993) (holding that FDA letter had "no current operative effect" and "cannot govern future agency actions" and that claims resting on that letter were moot).

9. We acknowledge Western's insistence that no other site on Dead Indian Mountain meets its needs and that Cellular One's tower may not provide Western with the vertical separation it requires to avoid interference with other users.

The Service should take Western's broadcasting needs into account in any further decisionmaking regarding communications activities on Dead Indian Mountain.

## VI. CONCLUSION

The Service granted Cellular One a special use permit after following the required procedures; its decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the applicable law. The *Ashbacker* doctrine does not apply to the Service's special use permit decisions. Western's Small letter claims are moot. We therefore AFFIRM the district court's decision granting summary judgment to the Service.